UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| LYNN M. DICKEY, ET AL., | : | |
| --- | --- | --- |
| | : | NO.: 3:08-CV-1179 |
| Plaintiffs | : | |
| | : | (JUDGE VANASKIE) |
| v. | : | (MAGISTRATE JUDGE PRINCE) |
| | : | |
| WAYNE COUNTY, ET AL., | : | |
| | : | |
| Defendants | : | |
| | : | |

# **REPORT AND RECOMMENDATION**

Pursuant to an Order entered on April 8, 2010 (Doc. 70), Honorable Thomas I. Vanaskie referred the parties pending Motions for Judgment on the Pleadings to the undersigned for the purpose of preparing a Report and Recommendation.

Plaintiffs, Lynn M. Dickey and Michael T. Organ, commenced this action pursuant to 42 U.S.C. § 1983 on June 23, 2008 as individuals and co-administrators of the estate of their son, Clayton James Organ ("Decedent"). (Doc.1). Named as Defendants to this lawsuit are Wayne County, the Wayne County Prison Board, and Wayne County Prison Warden Craig Chalmers.[1] The complaint alleges that while he was housed at the Wayne County Work Release Center ("WRC"), Decedent voluntarily engaged in wrestling with another inmate,

---

[1] Wayne County Prison was dismissed as a Defendant by stipulation of the parties. (Doc. 19).

during the course of which he struck his head on the floor. Decedent later complained of nausea and dizziness and subsequently became unresponsive. After paramedics were called, Decedent was transferred to the hospital, where he was pronounced dead. The cause of death was listed as blunt cerebral trauma.

On September 20, 2009, Defendants filed a Motion for Summary Judgment (Doc. 35) along with a brief in support of the motion (Doc. 38) and supporting materials (Docs. 36, 39-53). Plaintiffs filed their brief in opposition to the motion (Doc. 59) and supporting materials (Docs. 58, 60-68) on October 15, 2009. For the reasons that follow, the undersigned will recommend that the motion be granted.

**I. Background**

The background for this matter is taken from the allegations contained in the Plaintiffs' complaint as well as statements of material facts submitted by the parties. It will be noted where the parties disagree as to a material fact.

According to the complaint, Plaintiffs' son, Clayton James Organ, was incarcerated at the Wayne County Prison and housed at the Wayne County Work Release Center ("WRC") (Doc. 1, ¶ 12). On June 23, 2006, at approximately 10:30 p.m., Decedent and another inmate, Richard Montelavo, began to wrestle, during which Decedent's head struck the floor. (Doc. 1, ¶ 15). Decedent

subsequently complained of jaw pain and increased nausea and dizziness. (Doc. 1, ¶ 20). Later that evening, the Decedent was found unconscious on the bathroom floor. (Doc. 1, ¶ 21). He was transported to Wayne Memorial Hospital, arriving at approximately 1:30 a.m. (Doc. 1, ¶ 21). He was subsequently transferred to Community Medical Center, where he was pronounced dead at approximately 8:45 a.m. on June 24, 2006 due to blunt force trauma. (Doc. 1, ¶ 23).

Plaintiffs argue that prison officials ignored signs of Decedent's head injury, noting that responding paramedics observed bruising around Decedent's head. Defendants contend, however, that they did not observe any indications of an assault on the Decedent prior to paramedics arriving, and that the bruise noted by the paramedics was only slightly visible. Additionally, Plaintiffs maintain that Warden Chalmers selected individuals from the Wayne County Correctional Facility to be housed in the WRC. They assert further that this method of housing inmates fails to consider the inmate's background, underlying conviction and propensity towards violence, thereby jeopardizing the safety of the WRC. As a result of this deficient classification system, they allege, Inmate Montelavo was improperly housed at the WRC, and posed a threat to the Decedent, given the violent nature of his criminal history. Plaintiffs finally contend that the staffing levels at the WRC were inadequate to properly supervise the inmates and activities

there.

**II. Standard of Review**

Federal Rule of Civil Procedure 56(c) requires the court to render summary judgment " . . . forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]his standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis in original).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. <u>Anderson</u>, 477 U.S. at 248; <u>Gray v. York Newspapers, Inc.</u>, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Anderson</u>, 477 U.S. at 257; <u>Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America</u>, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the

4

court must view the facts and all reasonable inferences in favor of the nonmoving party. Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consolidated Rail Corporation, 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Electric Company, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56(c) of identifying evidence which demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56(e) to go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. Celotex Corporation v. Catrett, 477 U.S. 317, 324 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industrial Co. v. Zenith Radio, 475 U.S. 574, 586 (1986). When Rule 56(e) shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323. *See* Harter v. G.A.F. Corp., 967 F.2d 846,

851 (3d Cir. 1992).

**III. Discussion**

In their Motion for Summary Judgment, Defendants maintain that Plaintiffs have failed to state a claim under the Eighth Amendment inasmuch as they cannot establish that the Defendants were deliberately indifferent to Decedent's serious medical needs. They assert further that Warden Chalmers is entitled to qualified immunity on the claim.

*(A) Deliberate Indifference*

It is well-settled that prison officials have a duty under the Eighth Amendment to "take reasonable measures to guarantee the safety of inmates." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (internal quotations omitted). In order to state a viable § 1983 claim, a plaintiff must allege that the conduct complained of was committed by a person acting under color of state law and that said conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or by laws of the United States. Cohen v. City of Philadelphia, 736 F.2d 81, 83 (3d Cir. 1984), *cert. denied*, 469 U.S. 1019 (1984). A prerequisite for a viable civil rights claims is that a defendant directed, or knew of and acquiesced in, the deprivation of a plaintiff's constitutional rights. Monell v. Department of Social Serv. of the City of N.Y., 436 U.S. 658 (1978); Gay v. Petsock, 917 F.2d

768, 771 (3d Cir. 1990); Capone v. Marinelli, 868 F.2d 102, 106 n. 7 (3d Cir. 1989); Rode v. Dellarciprete, 845 F.2d 1195, 1207-08 (3d Cir. 1988).

As with other conditions of confinement, medical care provided to inmates is subject to scrutiny under the Eighth Amendment's prohibition against cruel and unusual punishment. Wilson v. Seiter, 501 U.S. 294, 297 (1991). The relevant inquiry in the context of medical care is two-pronged: "it requires deliberate indifference to a prisoners serious illness or injury." Estelle v. Gamble, 429 U.S. 97, 105 (1976).

In determining "deliberate indifference" with regard to an Eighth Amendment claim, the Supreme Court has established that the proper inquiry is whether a prison official "acted or failed to act despite his knowledge of a substantial risk of serious harm." Farmer v. Brennan, 511 U.S. 825, 842 (1994). "Whether . . . prison official[s] had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a fact finder may conclude that . . . prison official[s] knew of a substantial risk from the very fact that the risk was obvious." Farmer, 511 U.S. at 842. This may be demonstrated "[w]hen ... prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or to deny access to a physician capable of evaluating the need for such

7

treatment." Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326 (3d Cir. 1987) (citing Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979)).

However, deliberate indifference is more than a mere lack of ordinary due care; it is a state of mind equivalent to a reckless disregard of a known risk of harm. Farmer at 834. To constitute deliberate indifference as defined in Farmer, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. "The deliberate indifference standard set out in Farmer is a high one[.]" Beers-Capitol v. Whetzel, 256 F.3d, 120 137 (3d Cir. 2001).

A denial of a reasonable request for medical treatment, an intentional refusal to provide known needed medical care, and a purposeful delay in providing this care have all been held to constitute deliberate indifference. Litz v. City of Allentown, 896 F. Supp. 1401, 1409 (E.D. Pa. 1995) (citing Monmouth County Correctional Inst. Inmates, *supra.* On the other hand, allegations amounting only to malpractice or mere negligence (i.e., a lack of due care) have consistently been held not to raise issues of constitutional import. Id.; *see also* Estelle, 429 U.S. at 106 FN 14. "Where the plaintiff has received some care, inadequacy or impropriety of the care that was given will not support an Eighth Amendment

8

claim." Norris v. Frame, 585 F.2d 1183, 1186 (3d Cir. 1978).

In their complaint, Plaintiffs essentially allege the following acts or omissions by the Defendants giving rise to the death of their son: improperly placing inmates unsuited for minimal supervision in the WRC; failing to provide Decedent with prompt and appropriate medical care; and inadequately staffing the WRC so that proper supervision of the center and its residents could occur. Defendants maintain in their Motion for Summary Judgment and supporting documents that these acts and/or omissions are insufficient to establish deliberate indifference on their part.

*1. Medical Aid to the Decedent*

Plaintiffs first argue that the actions of the Defendants failed to provide the Decedent with adequate medical care. Defendants claim that, regardless of what medical care was required in the situation, their actions do not rise to the level of deliberate indifference necessary for liability to attach in the instant matter.

Testimony of the officers assigned to the WRC on June 23, 2006 indicates that officers routinely receive basic first aid training to respond to medical situations. (Doc. 36, ¶¶ 18-19, 25). One officer at the WRC recalled that when he started his shift, the Decedent was at a table with other inmates playing cards. (Id. at ¶ 31). After being notified that the Decedent was ill, the officer testified that the

9

Decedent was alert and communicated that he was just sick. (Id. at ¶ 32). Moreover, when he became ill, the Decedent appeared to be otherwise acting normally and refused medical attention, suggesting that his dire condition was not only not evident to others but also not apparent to him. (Id. at ¶¶ 7, 32). He further stated that he did not observe any bruising on the Decedent's head. (Id. at ¶ 32). The officer did not feel an emergency situation was present. (Id. at ¶ 34). When asked if he needed to go to the hospital, the Decedent indicated he did not. (Id.) After being notified that the Decedent subsequently became unresponsive, the officer requested ambulance assistance. (Id. at ¶ 35). Defendants note that Decedent's prior activity that evening, wrestling and hitting his head on the floor, was not communicated to any corrections officers. (Id. at ¶ 37; Doc. 53 p. 9, 11-12).

Plaintiffs argue that the Defendants failed to provide proper medical attention to the Decedent before he became unresponsive. As noted above, however, the Decedent was nauseated and did not acquiesce to the offer of medical assistance. The officer on duty testified that he did not feel that circumstances indicated an emergency situation, an assessment apparently shared by the Decedent, who in declining medical aid stated that he was just sick. Additional care, therefore, did not seem warranted. Once the Decedent became

10

unresponsive, however, officers recognized the need for emergency medical attention and called for an ambulance. Given that the officers were not informed the Decedent had struck his head earlier that evening, that the Decedent initially appeared sick but otherwise responsive, and the lack of any other indicators suggesting a serious medical condition requiring urgent attention prior to the Decedent becoming unconscious, the court concludes that the facts, viewed in a light most favorable to the Plaintiffs, fail to establish deliberate indifference on the part of the Defendants. Under no circumstances do the facts, as stated, establish that the Defendants knew the seriousness of the Decedent's condition and intentionally disregarded the risk of harm to him through a failure or a delay in providing emergency medical care.

The testimony demonstrates not only that the correctional officers did not draw an inference of a serious medical need of the Decedent, but also that they were unaware of facts to lead them to draw such an inference. Defendants correctly observe that what could have been done differently in handling this medical situation or what knowledge further, skilled medical training would have imparted on the Defendants and Correctional Officers is immaterial to a deliberate indifference analysis. Accordingly, under the subjective prong of <u>Farmer</u>, Defendants cannot be said to have known of a serious medical need of the

11

Decedent which they disregarded.  Monmouth County Correctional Institutional Inmates, 834 F.2d at 347 (A medical need is serious if it is one that has been diagnosed by a physician as mandating treatment or is one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.). Plaintiffs are unable, consequently, to establish deliberate indifference by the Defendants on this issue.

*2. Assignment of Inmates to WRC*

Plaintiffs also contend that, based on his criminal charges,[2] Inmate Montelavo was a violent individual who should not have been housed in the WRC.  They aver further that Warden Chalmers' selection and assignment of inmates from the Wayne County Prison to the WRC, in the absence of a written policy, exceeds his authority and effectively alters the convictions and sentences under which the inmates are incarcerated.  Defendants assert, however, that Inmate Montelavo's placement at the WRC was not improper, noting his lack of disciplinary record while incarcerated, coupled with his positive school attendance and work performance.  (Doc. 36, ¶ 58-60, 62).

The court is unpersuaded by Plaintiffs' argument attempting to equate Warden Chalmers actions in selecting the inmates to be housed at the WRC with a

---

[2] Montelavo was convicted of disorderly conduct and simple assault.

12

modification of the terms of a judgment and conviction imposed by the court. The role of the prison clearly includes the classification of inmates for housing purposes. *See, e.g.* Rivera v. Martinez, No. 1:08-cv-1040, 2008 WL 4200133 (M.D. Pa. Sept. 9, 2008) (Caldwell, J.) (noting that the duty to classify and segregate federal prisoners in penal and correctional institutions, as set forth in 18 U.S.C. § 4081, is within the discretion of the BOP); Wilkerson v. Maggie, 703 F.2d 909, 911 (5th Cir.1983) (it is well settled that prison officials must have broad discretion, free from judicial intervention, in classifying prisoners in terms of their custodial status). *See also* Murphy v. Fenton, 464 F.Supp. 53 (M.D. Pa. 1978) (Federal court must exercise care in interfering with broad discretion afforded prison officials, especially when it comes to classification of prisoners.); Mims v. Shapp, 457 F.Supp. 247 (W.D. Pa. 1978) (Federal courts must be extremely reluctant to limit the freedom of prison officials to classify prisoners as the officials, in their broad discretion, may deem appropriate.); U. S. ex rel. Hoss v. Cuyler, 452 F.Supp. 256 (E.D. Pa. 1978) (same).

    The Plaintiffs have not put forth facts sufficient to conclude that the placement on Inmate Montelavo in the WRC was unreasonable, much less constituted deliberate indifference to the safety of the Decedent. The facts do not indicate that Inmate Motelavo's alleged violent criminal behavior is a material

13

factor contributing to the death of their son. The wrestling in which the Decedent and Montelavo engaged was consensual and, in fact, suggested by the Decedent. (Doc. 58, ¶ 66). The evidence rather demonstrates like-minded individuals engaging in horse-play, with unexpected and unintended consequences. The nature of activity itself, more than the nature of the individuals participating, created the potential for a dangerous situation. Consequently, Plaintiffs have not carried their burden of establishing the manner and method of selecting inmates for the WRC poses a serious risk of harm to the inmates housed there.

*3. Staffing of WRC*

Plaintiffs finally assert that the WRC often left inmates unsupervised, creating the potential for unsafe behavior and/or conditions. The lack of adequate staffing levels, they argue, left inmates unsupervised and permitted dangerous activities, such as wrestling, to occur. However, correctional officers stated that any issues of horseplay were infrequent. (Doc. 36, ¶ 27). The officer assigned to the WRC may leave the building to search the perimeter, remove trash, or escort an inmate to the prison in the performance of his duties. (Id. at ¶ 23). Warden Chalmers testified that the assignment of one officer per shift to the WRC was appropriate given the low security setting. (Id. at ¶ 40). At the WRC, inmates move around freely, leave the facility with permission and work off-site,

14

suggesting that more than minimal supervision is not required. (Id.).

While attempting to argue that housing at the WRC, a less restrictive setting than the prison, requires the supervision of more than one officer per shift, Plaintiffs have not put forth any evidence correlating a serious risk of harm to inmates to the staffing level of one officer per shift at the WRC. Warden Chalmers, who has over 20 years of prison administration experience in facilities across the country, stated that one officer per shift at the WRC was an appropriate. (Doc. 41, Ex. C, p. 6-8, 23). He further observed that there were never more than 30 inmates housed at the WRC and that the WRC allowed inmates free movement within the facility and approved movement outside of the facility. (Id. at 24-25). Given these circumstances, Defendant Chalmers noted that increased levels of supervision were not needed. (Id. at 23). The Warden's opinions were supported by David Keenhold, who has 31 years of operating and administering prisons. (Doc. 51, Ex. N, p. 2). Mr. Keenhold observed that staffing the WRC with one officer is an acceptable management style, considering that the inmates are released into the community daily with little or no supervision. (Id. at 5). Based on these facts, it cannot be concluded that the staffing at the WRC was so inadequate on June 23, 2006 as to rise to the level of deliberate indifference.

## (B) Qualified Immunity

The doctrine of qualified immunity provides "government officials performing discretionary functions ... [a shield] from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Thus, the qualified immunity doctrine "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." Rowe v. Romano, 940 F.Supp. 798, 802 (E.D. Pa.1996); Hunter v. Bryant, 502 U.S. 224, 229 (1991). Qualified immunity is an affirmative defense which must be pleaded by the defendant official. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988); Verney v. Pennsylvania Turnpike Comm'n, 881 F.Supp. 145, 149 (M.D. Pa. 1995).

The United States Supreme Court in Saucier v. Katz, 533 U.S. 194 (2001), established a two part test for analyzing qualified immunity claims. *See* also Curley v. Klem, 298 F.3d 271 (3d Cir. 2002); Bennett v. Murphy, 274 F.3d 133 (3d Cir. 2002). The initial inquiry in a qualified immunity examination is whether "the facts taken in the light most favorable to the plaintiff show a constitutional violation." Bennett, 274 F.3d at 136. "Once it is determined that evidence of a constitutional violation has been adduced, courts evaluating a qualified immunity

16

claim move to the second step of the analysis to determine whether the constitutional right was clearly established. That is, in the factual scenario established by the plaintiff, would a reasonable officer have understood that his actions were prohibited?" Id. Accordingly, the violation of a clearly established right must be such that a reasonable official would understand that his actions violate the right at issue; the official action need not be unlawful, but "in light of pre-existing law, the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987) (citations omitted).

As stated above, the actions or omissions of the Defendants do not rise to the level of deliberate indifference. Inasmuch as the court has concluded that a constitutional violation did not occur, it is unnecessary to proceed further in a qualified immunity analysis.

## V. Recommendation

Based on the foregoing, it is respectfully recommended that Defendants' Motion for Summary Judgment (Doc. 35) be granted.


Date: May 7, 2010               s/ William T. Prince
                                William T. Prince
                                United States Magistrate Judge