IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LYNN M. DICKEY, *et al.*, | : | |
| | : | 3:08-cv-1179 |
| Plaintiffs, | : | |
| | : | Hon. John E. Jones III |
| v. | : | |
| | : | Hon. William T. Prince |
| WAYNE COUNTY, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

**August 6, 2010**

**THE BACKGROUND OF THIS MEMORANDUM IS AS FOLLOWS:**

This matter is before the Court on the Report and Recommendation ("R&R") of Magistrate Judge William T. Prince (Doc. 73), filed on May 7, 2010, which recommends that we grant the Motion for Summary Judgment (Doc. 35) of Defendants Wayne County, the Wayne County Prison Board, and Wayne County Prison Warden Craig Chalmers (collectively "Defendants"). On May 20, 2010, Plaintiffs Lynn M. Dickey and Michael T. Organ ("Plaintiffs") filed objections to the R&R and a memorandum in support thereof. (Docs. 74, 75). Defendants filed a brief in opposition to Plaintiffs' objections on June 4, 2010. (Doc. 76). Accordingly, this matter is ripe for our review.

**I.     STATEMENT OF FACTS AND OF THE CASE**

On June 23, 2008, Plaintiffs commenced the underlying action in the United States District Court for the Middle District of Pennsylvania as individuals and as co-administrators of the estate of their son, Clayton James Organ ("Decedent"), pursuant to 42 U.S.C. § 1983 and arising under the Eighth Amendment to the United States Constitution. (Doc. 1).[1] Defendants filed a Motion for Summary Judgment (Doc. 35) on September 30, 2009, which was referred by the Honorable Thomas I. Vanaskie to Magistrate Judge Prince for purposes of creating the Report and Recommendation currently at issue. (Doc. 70).[2]

In the R&R, Magistrate Judge Prince outlined the primary undisputed facts, taken from the complaint and from the parties' supplemental filings, as follows:

> According to the complaint, Plaintiffs' son, Clayton James Organ, was incarcerated at the Wayne County Prison and housed at the Wayne County Work Release Center ("WRC") (Doc. 1, ¶ 12). On June 23, 2006, at approximately 10:30 p.m., Decedent and another inmate, Richard [Montalvo], began to wrestle, during which Decedent's head struck the floor. (Doc. 1, ¶ 15). Decedent subsequently complained of jaw pain and increased nausea and dizziness. (Doc. 1, ¶ 20). Later that evening, the Decedent was found unconscious on the bathroom floor. (Doc. 1, ¶ 21). He was transported to Wayne Memorial Hospital, arriving at approximately 1:30 a.m. (Doc. 1, ¶

---

[1] Plaintiffs also initially asserted Fifth and Fourteenth Amendment claims and state law claims of wrongful death and survival, but these were ultimately dismissed by agreement of the parties. *Id*. at 2.

[2] On June 21, 2010, this matter was reassigned to us from Judge Vanaskie.

21). He was subsequently transferred to Community Medical Center, where he was pronounced dead at approximately 8:45 a.m. on June 24, 2006 due to blunt force trauma. (Doc. 1, ¶ 23).

(Doc. 73 pp. 2-3). Magistrate Judge Prince then identified Plaintiffs' three basic allegations against Defendants: "failing to provide Decedent with prompt and appropriate medical care," "improperly placing inmates unsuited for minimal supervision in the WRC," and "inadequately staffing the WRC so that proper supervision of the center and its residents could occur." *Id*. at 9.

The Magistrate Judge found that the allegations could not support an Eighth Amendment claim. The evidence indicated that none of the corrections officers on duty the night of the incident knew of Decedent's injury, that Decedent communicated "he was just sick," and declined medical treatment, and that after it became clear that Decedent was unresponsive and seriously ill, officers called for an ambulance. *Id*. at 9-11. Thus, the Magistrate Judge held that the facts viewed in a light most favorable to the Plaintiffs failed to establish the deliberate indifference required to maintain an Eighth Amendment violation. *Id*. at 11; *see also id*. at 7-8 (explaining the "deliberate indifference" requirement and relevant inquiry)[3] (discussed *infra*, note 3). Similarly, the Magistrate Judge concluded that

---

[3]"As with other conditions of confinement, medical care provided to inmates is subject to scrutiny under the Eighth Amendment's prohibition against cruel and unusual punishment. Wilson v. Seiter, 501 U.S. 294, 297 (1991). The relevant

3

the facts failed to show that the placement of inmate Montalvo in the WRC was unreasonable or constituted deliberate indifference to Decedent's safety, since prison officials have broad authority to classify inmates for housing purposes, and because the wrestling which led to Decedent's injury was consensual and initiated by Decedent himself. *Id*. at 13-14. Finally, the Magistrate Judge referred to the testimony of Warden Chalmers, which was corroborated by a supporting expert, to the effect that the staffing of one officer per shift at the WRC was adequate and appropriate. *Id*. at 15. The Magistrate Judge found that Plaintiffs did not offer any evidence that this staffing level created a serious risk of harm such as would rise to the level of deliberate indifference. *Id*. For these reasons, the Magistrate Judge recommended that Defendants' Motion for Summary Judgment be granted. *Id*. at 17.

Plaintiffs object to the R&R on five asserted grounds: (1) the facts used by the court as to Decedent's condition and treatment do not favor the non-moving party; (2) the court used federal law to analyze the placement of inmates in the WRC, rather than Pennsylvania law; (3) the court relied on Defendant Warden Chalmers's testimony, despite the existence of contradictory testimony by

---

inquiry in the context of medical care is two-pronged: 'it requires deliberate indifference to a prisoners [*sic*] serious illness or injury.' Estelle v. Gamble, 429 U.S. 97, 105 (1976)." *Id*. at 7.

4

Plaintiffs' expert and a corrections officer; (4) the court incorrectly found a lack of evidence correlating serious risk of harm and the WRC's staffing level, given a past wrestling incident, a basic rule against horseplay, and inmates' general unsupervision; and (5) the court failed to consider an expert report offered by Plaintiffs. (Doc. 74). These objections are the subject of our present review.

## II. STANDARDS OF REVIEW

### A. Objections to Magistrate Judge's Report

When objections are filed to the report of a magistrate judge, the district court makes a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objections are made. 28 U.S.C. § 636(b)(1); *United States v. Raddatz*, 447 U.S. 667, 674-75 (1980). The court may accept, reject, or modify, in whole or in part, the magistrate judge's findings or recommendations. *Id.* Although the standard of review is *de novo*, 28 U.S.C. § 636(b)(1) permits whatever reliance the district court, in the exercise of sound discretion, chooses to place on a magistrate judge's proposed findings and recommendations. *Raddatz*, 447 U.S. at 674-75; *see also Mathews v. Weber*, 423 U.S. 261, 275 (1976); *Goney v. Clark*, 749 F.2d 5, 7 (3d Cir. 1984).

### B. Summary Judgment

5

Summary judgment is appropriate if the record establishes that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). An issue is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a factual dispute is "material" only if it might affect the outcome of the action under the governing law. *Id.* at 248. In making this determination, the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the non-moving party. *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

## III. DISCUSSION

Plaintiffs' first claim is an Eighth Amendment inadequate care claim.[4] As indicated above, Plaintiffs assert that the facts used by Magistrate Judge Prince in analyzing this claim did not favor the non-moving party and thus the Magistrate Judge committed error. (Doc. 75 p. 9). To wit, in their brief Plaintiffs note several facts that are not included in the R&R. *See id.* at 10-12. These facts essentially provide a more detailed account of the specific events that occurred on the night in question after Decedent became sick.[5]

---

[4]As Magistrate Judge Prince correctly states, an Eighth Amendment violation respecting medical care requires "deliberate indifference" to a prisoner's serious illness or injury. *Supra*, note 2. Deliberate indifference, in turn, depends on whether a prison official "acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). "Whether . . . prison official[s] had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a fact finder may conclude that . . . prison official[s] knew of a substantial risk from the very fact that the risk was obvious." *Id*. *See* Doc. 73 pp. 7-8.

[5]
> Montalvo recalls that Organ looked tired, like he had just woken up. . . . [H]e saw Organ in the stall, lying down, but on his knees. He was holding his stomach, but had not thrown up. Organ told Montalvo that his stomach hurt, that he felt nauseous, sick. Montalvo recalls that he went to get [Sgt.] Shencavitz and that Shencavitz went to check on Organ. . . . [T]he C.O. told Organ he needed to get off the floor and up to the toilet if he was going to throw up. The C.O. then left. . . . [Montalvo] tried to pick him up and he told [Montalvo] not to touch him so he left him on the floor. . . . Montalvo thought maybe he was having trouble breathing because of the vomit[,] so he tried to reposition his head[,] but it didn't make any difference.
>
> . . . Sergeant Bishop told him [to] get up off the floor. Inmate Organ then kneeled in front of the toilet and vomited. [S]ome time later inmate Montalvo came back to [Sgt. Shencavitz's] office and stated that inmate Organ was lying on the floor again in the bathroom. At that time [Shencavitz] found inmate Organ unconscious. He left him with two inmates because he was still throwing up but he wasn't

While we are cognizant of these facts and construe them in the light most favorable to Plaintiffs, we are constrained to note that Plaintiffs have not adduced any evidence indicating that Defendants knew of Decedent's wrestling or subsequent head injury. Indeed, all the evidence is to the contrary. *See, e.g.*, Doc. 40 pp. 144-146 (testimony of Sgt. Shencavitz as to the same). Further, Plaintiffs have not contradicted Defendants' evidence, which indicates that Decedent not only told prison officials he was "just sick," but also that he declined medical attention.

In light of the aforementioned, and because there were no obvious signs of serious injury visible on Decedent's person,[6] we believe the facts indicate that the

---

> responding and there was saliva near his mouth. He had inmates keep [Decedent] on his side so that he didn't choke on his vomit. [Shencavitz] stated that the paramedics observed bruises on inmate Organ and then pointed them out to him and that he saw them once they were pointed out to him. He stated that when he found inmate Organ[,] he heard what sounded like gurgling.

*Id.* (internal citations omitted).

[6]The EMT who examined Decedent noted that the indicators of head injury he observed were "trismus, posturing, [and] dilated pupils," and he stated that, "I don't think externally there were any signs of severe gross trauma, not that I can recall. I don't believe I documented anything exceptional." Doc. 43 pp. 13-14. Additionally, Sgt. Shencavitz testified that he did not observe any bruises or discolorations about Decedent's head or face before medical personnel arrived (Doc. 40 pp. 86, 98) – though even if he *had*, Plaintiffs have not offered evidence suggesting that this would have alerted him to a substantial risk of serious injury. *See* Doc. 75 p. 12 (corrections officers not trained as to head injuries).

prison officials were not aware of the dire conditions that befell Decedent.[7]

Consequently, we believe that the facts as construed in favor of the Plaintiffs indicate that the first time prison officials became aware of a substantial risk of serious harm to Decedent was when he became unresponsive, at which point an ambulance was called. Therefore, it is our view that Defendants' conduct does not rise to the level of deliberate indifference.[8] Thus, we shall overrule Plaintiffs' objections to this extent.

Second, Plaintiffs object to the Magistrate Judge's use of federal law, rather than Pennsylvania law, when analyzing the placement of inmates in the WRC. Specifically, Plaintiffs argue that Warden Chalmers's method of placing inmates in the WRC violates Pennsylvania Code § 95.225[9] because it lacks a written

---

[7]Indeed, there is substantial reason to doubt Decedent himself recognized or appreciated the seriousness of the situation.

[8]*See Beers-Capitol v. Whetzel*, 256 F.3d 120, 137 (3d Cir. 2001) (Plaintiffs' evidence not sufficient to show that risk of harm was so great and so obvious that Defendant must have known of the excessive risk but was indifferent to it).

[9] The following minimum requirements apply to classification:

(1) An inmate classification plan shall be documented in written local policy.
(2) This plan shall establish classification based on the degree of security risk and need for supervision. The classification plan shall specify the following:
    (i) How the classification process is accomplished.
    (ii) What process of appeals exist.
    (iii) The review mechanism utilized.
    (iv) Explicit procedures for reclassification.
37 Pa. Code § 95.225.

classification plan, meaning that Montalvo's placement there, which led to Decedent's death, was illegal. (Doc. 75 pp. 13-14). While Plaintiffs may attempt to cast this claim in a different fashion, it is our view that these allegations raise an Eighth Amendment failure to protect claim. Thus, this objection is merely a red-herring because it invites the Court to find an Eighth Amendment violation based on the failure of the Defendants to follow the classification statute, which, standing alone, does not satisfy the touchstones for a claim of this type.

The standard for Eighth Amendment failure to protect claim is essentially the same as above – it requires that the inmate is "incarcerated under conditions posing a substantial risk of serious harm" and that a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and she must also draw the inference." *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997) (quoting *Farmer*, 114 S. Ct. at 1977, 1979). For the following reasons, we do not find Plaintiffs' evidence satisfies this standard.

First, there is no evidence indicating that Warden Chalmers's method of classifying inmates, although not done pursuant to a written plan, jeopardized the safety of those in the WRC. Indeed, there is no indication that this failure to maintain a written policy resulted in the misclassification of any inmates

whatsoever.[10] Second, there was no evidence indicating that Montalvo posed a substantial threat to the safety of other inmates in the WRC. Although he was incarcerated for simple assault and disorderly conduct, by all accounts Montalvo was a "model inmate." (Doc. 72 p. 2).[11] Consequently, we do not believe the evidence can establish that either the general method of placing inmates in the WRC or the specific placement of Montalvo posed an excessive risk to inmates that Defendants consciously disregarded. Therefore, we shall overrule the objection to this extent.

Plaintiffs' third, fourth, and fifth objections can be combined into a single assertion: that the Magistrate Judge ignored material evidence put forth by Plaintiffs regarding the safety of inmates at the WRC engendered by its staffing level. We construe this claim as a failure-to-protect claim, as well. Plaintiffs assert that the staffing level in the WRC, which consisted of one guard per shift, was inadequate. They support this contention with the testimony of Corrections Officer

---

[10]While Chalmers' conduct may have technically violated state law regarding classification, we believe that at most this constitutes negligence, and it therefore fails to rise to the level of an Eighth Amendment violation.

[11]This assessment of Montalvo is supported by the events occurring on the night of Decedent's death. The wrestling that night was instigated not by Montalvo, but by Decedent. (Doc. 73 p. 14). Further, when Montalvo saw that Decedent was ill, he displayed compassion by coming to his aid and alerting prison officials. (Doc. 75 pp. 10-12).

Bishop ("Bishop")[12] and their expert, experienced prison administrator Ray Colleran ("Colleran"),[13] a prison misconduct report signed by Warden Chalmers,[14] and arguments about horseplay and unsupervision. (Doc. 75 pp. 14-20).

None of this evidence is sufficient to raise a genuine issue of material fact as to Defendants' deliberate indifference under *Farmer*. First, a close reading of Bishop's deposition testimony shows that his comment regarding staffing was directed at the prison, not the WRC – which are two distinct places of incarceration. (Doc. 39 pp. 17-19). Second, while Colleran's testimony creates a dispute of fact related to the objective prong of Eighth Amendment analysis, it sheds no light on the subjective prong, i.e. whether Defendants knew of a substantial risk of harm to inmates at the WRC created by allegedly insufficient staffing. Similarly, knowledge of a substantial risk cannot be imputed to Defendants based upon the fact that similar wrestling had occurred at least once in

---

[12]Bishop testified that he thought "there should have been one more man on in the *prison*" during the shift he worked. (Doc. 39 p. 18) (emphasis added).

[13]Colleran testified that, in his opinion, staffing at the WRC was "inadequate to provide proper supervision to the inmates" and "placed the inmates and the staff in a dangerous situation." (Doc. 75 pp. 15-16).

[14]Plaintiffs offered a Misconduct Report (Doc. 61) for a similar incident in which two inmates at the WRC had apparently engaged in wrestling, signed by Warden Chalmers. Plaintiffs use this document, as well as testimony from Warden Chalmers as to the dangers of horseplay, to demonstrate Chalmers's awareness of the risk his low-supervision staffing decisions posed. (Doc. 75, pp. 16-18).

the past, without any evidence that serious injury resulted therefrom, as there would be no reason for Defendants to believe that the staffing at the WRC was insufficient to protect inmates from such harm.[15]  Consequently, we believe that there is no evidence from which a reasonable jury could conclude that Defendants were deliberately indifferent with respect to staffing at the WRC.  We shall therefore overrule Plaintiffs' objections.

## IV.   CONCLUSION

Inasmuch as we agree with Magistrate Judge Prince's well-reasoned recommendation, we will overrule the Plaintiffs' objections and grant the Defendants' Motion for Summary Judgment.  An appropriate order shall follow.

---

[15]While Warden Chalmers indicated generally that horseplay was dangerous because of its potential to incite prison riots (Doc. 41 p. 115), his further testimony showed that he was not aware of dangerous horseplay occurring in the WRC.  *See id*. at 115-20.  As for the incident report in which inmate Sonny Grabek is quoted as saying that "a lot of people [horseplay]," there is no indication either that such a cursory remark would have been believed by Warden Chalmers or that he had even read the statement.  *See id*. at 119 (Chalmers stating that he did not review all incident reports and did not recall having reviewed the Grabek incident report).